UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
WARREN ALBERT, D.C., and
NY CHIROPRACTIC CARE, P.C.,

           Plaintiffs,

  -against-　　　　　　　　　　　　**MEMORANDUM AND ORDER**
　　　　　　　　　　　　　　　　　　　　13-CV-4542 (FB) (RML)

SYLVIA BURWELL, in her official
capacity as Secretary of the United States
Department of Health and Human Services,
and the UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES,

           Defendants.
----------------------------------------------------x

*Appearances:*
| *For the Plaintiffs:* | *For the Defendants:* |
|---|---|
| JASON HSI | KATHLEEN ANNE MAHONEY |
| ROY W. BREITENBACH | United States Attorneys Office |
| Garfunkel Wild P.C. | Eastern District of New York |
| 111 Great Neck Road, Suite 503 | 271 Cadman Plaza East |
| Great Neck, NY 11021 | Brooklyn, NY 11201 |

**BLOCK, Senior District Judge:**

      Plaintiff Warren Albert, D.C. ("Dr. Albert"), a chiropractor, seeks judicial review of a final decision by the Secretary of the United States Department of Health and Human Services ("Secretary"), which determined that he owes Medicare approximately $575,000 because he provided inadequate documentation of his

chiropractic treatment.[1] Both parties move for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). For the reasons that follow, the Court grants Dr. Albert's motion and remands for further proceedings. The Secretary's motion is denied.

**I.**

**A.     The Statutory and Regulatory Framework**

Medicare is the federal health insurance program for the elderly and disabled. *See* 42 U.S.C. § 1395 *et seq*. This case concerns chiropractic services provided under Medicare Part B, a voluntary supplemental insurance program covering certain outpatient treatment. *See* 42 U.S.C. § 1395j *et seq*. Part B is administered by the Centers for Medicare & Medicaid Services ("CMS"), a federal agency within the Department of Health and Human Services, in conjunction with private contractors known as Medicare Administrative Contractors ("MACs"). *See* 42 U.S.C. § 1395kk-1.

As a general rule, physicians who provide services under Part B – "providers" in Medicare terminology – may only be reimbursed for treatment that is "reasonable and necessary." 42 U.S.C. § 1395y(a)(1)(A). Part B coverage of chiropractic service is further limited to include only treatment of the spine by means of manual

---

[1] Dr. Albert also sues on behalf of NY Chiropractic Care, P.C., a professional corporation registered and operated by Dr. Albert. For simplicity's sake, the Court will refer to the plaintiffs collectively as "Dr. Albert."

2

manipulation – that is, by use of the hands – to correct subluxations, which are "structural misalignments of the joints, other than fractures or complete dislocations, that require treatment only by nonsurgical methods." 42 C.F.R. §§ 411.15, 410.21(b)(1). In addition, the treatment "must have a direct therapeutic relationship to the patient's condition and provide reasonable expectation of recovery or improvement of function." Medicare Benefit Policy Manual, CMS Pub. No. 100–02, Ch. 15, § 240.1.3.

To obtain reimbursement under Part B, a provider must "furnish[] such information as may be necessary in order to determine the amounts due . . . ." 42 U.S.C. § 1395*l*(e). Congress did not specify what documentation a provider must submit but rather delegated the authority to make that determination to the Secretary, who may proceed via "formal regulations and (informal) instructional manuals and letters," *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 74 (2d Cir. 2006), or by delegating to MACs, who issue local coverage determinations, or LCDs,[2] specifying which services are reimbursable and what documentation is required to obtain reimbursement, *see* 42 U.S.C. § 1395ff(f)(2)(B).

As a chiropractor, Dr. Albert was required to follow two documentation

---

[2]A local coverage determination is "a determination by a fiscal intermediary or a carrier . . . respecting whether or not a particular item or service is covered on an intermediary- or carrier-wide basis . . . ." 42 U.S.C. § 1395ff(f)(2)(B).

3

guidelines. First, the Medicare Benefit Policy Manual (the "Policy Manual"), an interpretive manual issued by CMS, sets forth requirements for both initial and subsequent patient visits. *See* Policy Manual, CMS Pub. No. 100–02, Ch. 15, § 240.1.2. Second, since Dr. Albert submitted claims to National Government Services ("NGS"), a MAC, he was subject to a Local Coverage Determination for Chiropractor Services (the "Chiropractic LCD"), which was issued by NGS in 2008. *See* NAT'L GOV'T SERVS., LCD FOR CHIROPRACTIC SERVICES (L27350) (2008). The Chiropractic LCD largely reiterates the Policy Manual's requirements but also "provides clarification to educate providers." *Id.*

Three specific requirements contained in both the Policy Manual and Chiropractic LCD are relevant to this case:

1. Documentation of initial visits must include (1) the patient's medical history, (2) a description of the present illness, (3) a physical examination of the musculoskeletal system, (4) a diagnosis, (5) a treatment plan, and (6) the date of initial treatment. *See* Policy Manual, CMS Pub. No. 100-02, Ch. 15, § 240.1.2.2.A.

2. Documentation of subsequent visits must include (1) the patient's medical history, (2) a physical examination, (3) documentation of treatment, and (4) progress or lack thereof. *See id.*, Ch. 15, § 240.1.2.2.B.

3. A patient's medical history – required for both initial and subsequent visits – should include (1) symptoms causing the patient to seek treatment, (2) family history if relevant, (3) past health history, (4) mechanism of trauma, (5) quality and character of symptoms, (6) onset, duration, intensity, frequency, location and radiation of symptoms, (7) aggravating or relieving factors, and (8) prior interventions, treatments, medications, and secondary complaints. *See id.*, Ch. 15, § 240.1.2.

## B. The Medicare Payment System and Appeals Process

The Part B reimbursement system is administered by MACs, who "typically authorize payment of claims immediately upon receipt of the claims, so long as the claims do not contain glaring irregularities." *Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health & Human Servs.*, 468 F.3d 1347, 1349 (11th Cir. 2006). Later, post-payment audits may be conducted either by MACs or by independent auditors. *See* Medicare Program Integrity Manual, CMS Pub. No. 100–08, Ch. 3, § 3.2.2. If billing irregularities are discovered, the MAC may then recoup the overpayment from the provider. *See* 42 C.F.R. §§ 405.370, 405.371(a)(2).

When a MAC determines that a provider has been overpaid, the provider is entitled to five levels of administrative review: (1) redetermination by a MAC employee not involved in the initial overpayment determination, *see id.* §§ 405.940, 405.948; (2) reconsideration by a Qualified Independent Contractor ("QIC"), *see id.* § 405.960; (3) a hearing before an Administrative Law Judge ("ALJ"), *see id.* §§ 405.1000, 405.1002(a); (4) *de novo* review by the Medicare Appeals Council (the "Council"), either at the request of the provider, by referral from a MAC, or upon the Council's own motion, *see id.* §§ 405.1100, 405.1102(a), 405.1110; and (5) judicial review in federal court, *see* 42 U.S.C. § 405(g).

## C. Factual Background

Dr. Albert is licensed in New York and New Jersey. For all times relevant to this case, he rendered chiropractic treatment to elderly patients in nursing homes around the New York metropolitan area.

### 1. Initial overpayment determination

In January 2010, SafeGuard Services ("SGS"), an independent Medicare auditor, requested Dr. Albert's records for 57 patients treated from April 6, 2007 to August 8, 2009, which comprised 1,233 claims. During this period, Dr. Albert initially used a "fill-in-the-blanks" form for both initial and subsequent visits, which provided a limited selection of options that Dr. Albert could circle to assess a patient's history, condition, and treatment plan. Dr. Albert abandoned this form in mid-2007, and thereafter wrote narrative paragraphs for both initial and subsequent visits. For 21 of the patients reviewed by SGS (the "Fill-in-the-Blank Patients"), Dr. Albert used the fill-in-the-blanks form for all initial visits, and used a mix of fill-in-the-blanks forms and narrative paragraphs for subsequent visits. For the remaining 36 patients (the "Narrative Paragraph Patients"), Dr. Albert utilized narrative paragraphs for both initial and subsequent visits.

In May 2011, SGS informed him by letter that 100% of the claims that they reviewed were denied. SGS further stated that it had utilized a statistical sampling method and concluded that Dr. Albert was overpaid by $578,107.91. Dr. Albert

requested a redetermination by SGS and reconsideration by a QIC, both of which affirmed SGS's overpayment determination.

2. Appeal to the ALJ

Dr. Albert appealed and had a hearing before an ALJ on September 24, 2012. At the hearing, Dr. Albert testified that he treats patients only on referral from the attending physician, who must approve his proposed treatment plan before he commences chiropractic treatment. Dr. Albert further testified that, because the patient's medical records are voluminous and kept by the nursing home, he cannot include all the patient's medical history in his own documentation notes. Finally, he argued that the Chiropractic LCD's requirements are confusing and that he had requested assistance from CMS but "there's no real guidance" about how to comply. Administrative Record ("AR") 1871.

On January 13, 2013, the ALJ issued a written decision finding that Dr. Albert should be reimbursed for all but a small fraction of the 1,233 claims. In the decision, the ALJ concluded that the fill-in-the-blanks form did not satisfy the Chiropractic LCD requirements for *initial* visits because "there is no medical history listed . . . [and] the descriptions of the physical examination and treatment plan for those beneficiaries consists of only a few circled words." AR 34. The ALJ accordingly denied reimbursement for Dr. Albert's 21 initial visits with the Fill-in-the-Blanks Patients. However, the ALJ concluded that the fill-in-the-blanks form "demonstrat[ed]

7

substantial compliance" with the LCD's requirements for *subsequent* visits, and that "[t]o require stringent adherence to the [Chiropractic LCD's] documentation requirements when there is no evidence of educational intervention on the part of the carrier . . . would be against good consciousness [sic] and equity and have devastating financial consequences for [Dr. Albert]." *Id.* Finally, the ALJ found that the Narrative Paragraph Patients' files satisfied the documentation requirements for both initial and subsequent visits because those patients' notes "include detailed re-evaluation examinations listing a history of past treatments, assessments of treatment effectiveness, subluxation locations, and treatment plans." *Id.*

3. CMS's referral to Council

On January 25, 2013, CMS referred the ALJ's decision to the Council. In its referral, CMS argued that the ALJ erred by applying a "substantial compliance" standard because the Chiropractic LCD's requirements "are very specific and written such that [Dr. Albert] knew or should have known the requirements." AR 77. In particular, CMS argued that "[the Chiropractic LCD] lists eight specific items of information that constitute a patient's history . . . [but] [t]he ALJ failed to address whether the documentation in each beneficiary's case file . . . satisfied these eight elements." AR 76. CMS also argued that the ALJ erred by taking equitable considerations into account because "[w]hether [Dr. Albert] furnished [adequate] documentation . . . is a question of law and fact, not one of good conscience or equity."

8

AR 77.

### 4. The Council's decision

On June 6, 2013, the Council issued a written decision concluding that Dr. Albert should be denied reimbursement for all 1,233 claims. In its decision, the Council first emphasized that "the [Chiropractic LCD's] documentation criteria are explicit and consistent with the limited availability of Medicare coverage for chiropractic services." AR 16. The Council concluded that "there is no basis for the ALJ's determination that [Dr. Albert] should be afforded a broad-based benefit of the doubt based on lack of assistance from its Medicare contractor or a perceived lack of clarity of those requirements." AR 17.

The Council next examined a sample of the Narrative Paragraph Patients' files and concluded that each file failed to satisfy the requirements for both initial and subsequent visits. In so holding, the Council noted that a patient's medical history "requires documentation of a comprehensive, eight-element medical history," AR 18, and concluded that each file lacked one or more of those elements, *see, e.g.,* AR 19 ("There is no description of the beneficiary's prior medical history, interventions, aggravating or mitigating factors."); *id.* ("There is no discussion of the symptoms' onset, frequency, or duration, aggravating or relieving factors or baseline measurements of functional level."). The Council further noted that several of the Narrative Paragraph Patients' files exhibited other documentary shortcomings, for example failing to

9

identify the precise level of subluxation or the expectation of objective clinical improvement. *See* AR 18-20.

Finally, the Council examined a sample of the Fill-in-the-Blanks Patients' files and concluded that the fill-in-the-blanks forms failed to satisfy the Chiropractic LCD requirements because the forms "provide no discernible or measurable evidence of a beneficiary's medical history, physical examination, response to prior treatments and progress towards goals." AR 22.

Dr. Albert timely sought judicial review of the Council's decision.[3]

## II.

Dr. Albert concedes that the fill-in-the-blanks form does not satisfy the documentation requirements for initial visits and that the Fill-in-the Blanks Patients' 21 initial visits are therefore not reimbursable. However, he argues that the Council erred in denying the remainder of the claims for two reasons: first, by impermissibly applying the Chiropractic LCD retroactively; and second, by erroneously interpreting the Chiropractic LCD's requirements. The Court will address these arguments in turn.

---

[3]Separately, in November 2010, CMS determined that Dr. Albert had failed to comply with the Chiropractic LCD's documentation requirements for other claims covering approximately the same period. Dr. Albert appealed that determination and had another hearing before an ALJ on January 3, 2012. On February 24, 2012, the ALJ issued a written decision finding that Dr. Albert "complied with the Medicare documentation requirement for initial and subsequent visits and provided detailed medical history, examination, specific location of subluxation, diagnosis, treatment plan and goals." AR 261. The ALJ therefore concluded that "all the claims at issue in this appeal are payable by Medicare." *Id.* No appeal was taken from the ALJ's decision to the Council.

## A. The Council's Application of the Chiropractic LCD

Dr. Albert argues that since the Chiropractic LCD only went into effect in November 2008, the Council erred by retroactively applying it to his claims, which related to services rendered between April 2007 and August 2009.

The Court disagrees. While the ALJ and Council referred exclusively to the Chiropractic LCD throughout the administrative appeal process, the Chiropractic LCD simply restates requirements that have been in effect since 2003, when the Health Care Financing Administration (the precursor to CMS) amended the Medicare Carriers Manual (the precursor to the Policy Manual) to specify requirements for initial and subsequent patient visits. *See* U.S. DEP'T OF HEALTH & HUMAN SERVS., HCFA Pub. No. 14-3, TRANSMITTAL 1805, CHANGE REQUEST 2717 (June 2003). Those requirements, which became effective on June 27, 2003, and which were relocated to the Policy Manual in November 2003, are identical to the requirements at issue in this case. *Compare id.* at 2-3 (providing that initial visits must include a patient's medical history, description of present illness, evaluation of musculoskeletal system, diagnosis, treatment plan, and date of initial treatment), *with* Policy Manual, CMS Pub. No. 100-02, Ch. 15, § 240.1.2.2.A (same), *and* NAT'L GOV'T SERVS., LCD FOR CHIROPRACTIC SERVICES (L27350) (2008) (same).

The Chiropractic LCD concededly contains additional commentary and explication not found in the Policy Manual. However, this additional material

11

supplements, rather than supplants, the Policy Manual's requirements.[4] *See U.S. ex rel. Ryan v. Lederman*, No. 04-CV-2483, 2014 WL 1910096, at *4 (E.D.N.Y. May 13, 2014) (Gleeson, J.) ("LCDs are gapfillers: where there is no national rule, a local contractor may make its own rules."). Accordingly, the Council did not err by applying the Chiropractic LCD.

**B. The Council's Interpretation of the Chiropractic LCD**

Dr. Albert next contends that the Council committed legal error by interpreting the Chiropractic LCD's documentation requirements too strictly. As a preliminary matter, it is somewhat unclear what standard of review the Court should apply to the Council's legal interpretation of the LCD. The Supreme Court has, of course, "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). At the same time, whether a court defers to an agency's interpretation in a particular case "depends in significant part upon the interpretive method used and the nature of the question at

---

[4]At oral argument, Dr. Albert contended that the Chiropractic LCD introduced one new substantive requirement, namely that subsequent visits must include "[p]rogress or lack thereof, related to treatment goals and plan of case." NAT'L GOV'T SERVS., LCD FOR CHIROPRACTIC SERVICES (L27350) at 16 (2008). However, this 'new' requirement simply duplicates the pre-existing requirement that subsequent visits include "[an] assessment of [the] change in patient condition since last visit." *See* U.S. DEP'T OF HEALTH & HUMAN SERVS., HCFA Pub. No. 14-3, TRANSMITTAL 1805, CHANGE REQUEST 2717 at 3 (June 2003); Policy Manual, CMS Pub. No. 100-02, Ch. 15, § 240.1.2.2.B. Accordingly, this addition does not affect the Court's analysis.

issue." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

Accordingly, the Supreme Court has delineated various levels of administrative deference, the application of which depends on *who* is doing the interpreting, *what* is being interpreted, and *what form* the interpretation takes. As the Second Circuit has explained:

> When Congress has entrusted rulemaking authority under a statute to an administrative agency, we evaluate the agency's implementing regulations under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). . . . A similar deference applies when an agency interprets its own regulations. That interpretation, regardless of the formality of the procedures used to formulate it, is "controlling unless plainly erroneous or inconsistent with the regulation[s]." *Auer v. Robbins*, 519 U.S. 452, 461, 117 S. Ct. 905, 137 L. Ed. 2d 79 (1997) (internal quotation marks omitted) . . . . Even if neither *Chevron* nor *Auer* applies, an agency interpretation is still entitled to "'respect according to its persuasiveness'" under *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S. Ct. 161, 89 L. Ed. 124 (1944).

*Encarnacion ex rel. George v. Astrue*, 568 F.3d 72, 78 (2d Cir. 2009).

The distinction between these various levels is never crystal clear. *See United States v. W.R. Grace & Co.*, 429 F.3d 1224, 1235 (9th Cir. 2005) ("[T]he continuum of agency deference has been fraught with ambiguity."). The waters are muddier still in the Medicare context, since "[i]n cases such as this, where a highly expert agency administers a large and complex regulatory scheme in cooperation with many other institutional actors, the various possible standards for deference begin to converge." *Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 138 (2d Cir. 2002).

13

To resolve this question, the Court ordered supplementary briefing and oral argument on (1) what standard of review applies to the Council's legal interpretations, and (2) whether the Court should defer to the Council's interpretation. *See* Mem. & Order, Docket Entry No. 25 (Jan. 30, 2015). Having carefully considered the supplementary briefing, the Court concludes that its resolution of this question is controlled by *Estate of Landers v. Leavitt*, 545 F.3d 98 (2d Cir. 2008), as revised (Jan. 15, 2009). In that case, Medicare beneficiaries challenged the Policy Manual's interpretation of the word "inpatient," a term referenced by the Medicare statute and regulations but defined only by the Policy Manual. *Id.* at 104. Considering whether the Policy Manual was eligible for deference under *Chevron*, the Second Circuit acknowledged that "[m]ost agency interpretations that have qualified for *Chevron* deference are rules that have been promulgated in regulations issued through notice and comment or adjudication, or in another format authorized by Congress for use in issuing legislative rules." *Id.* at 106 (internal quotation marks omitted) (quoting *Cmty. Health Ctr.*, 311 F.3d at 138). The court further noted that "[a]lthough nonlegislative rules are not per se ineligible for *Chevron* deference as a general matter, we are aware of few, if any, instances in which an agency manual . . . has been accorded *Chevron* deference." *Id.*

The Second Circuit concluded that the Policy Manual, while not entitled to deference under *Chevron*, is nonetheless entitled to deference under *Skidmore*. *Id.* at

107. This case is admittedly somewhat different from *Estate of Landers*, since the Council is here interpreting the Policy Manual, and thus, in effect, interpreting an interpretation. However, given the Council's institutional expertise in interpreting the Part B statute and regulations, the reasoning of *Estate of Landers* is just as applicable in this case. Accordingly, the Court concludes that the Council's interpretation of the Chiropractic LCD should be accorded *Skidmore* deference.

Under *Skidmore*, the Council's interpretation is entitled to "respect according to its persuasiveness, as evidenced by the thoroughness evident in the agency's consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." *Sai Kwan Wong v. Doar*, 571 F.3d 247, 260 (2d Cir. 2009) (internal quotation marks and citations omitted) (quoting *Skidmore*, 323 U.S. at 140). Even under that deferential standard of review, however, the Court finds the Council's interpretation of the Chiropractic LCD – and in particular, of the LCD's medical history requirements – to be unpersuasive. The LCD states that physicians "must" comply with certain requirements and "should" comply with others. *Compare* Policy Manual, CMS Pub. No. 100–02, Ch. 15, § 240.1.2 ("The precise level of subluxation must be specified by the chiropractor . . . ."), *with id.*, Ch. 15, § 240.1.2.2.A ("The treatment plan should include the following . . . ."). Of relevance here, both initial and subsequent visits must include a patient's medical history, which in turn "should include" a list of eight factors, including "family

15

history if relevant," "onset, duration, intensity, frequency, location and radiation of symptoms," and "prior interventions, treatments, medications, and secondary complaints." *See id.*, Ch. 15, § 240.1.2.

The Council, however, ignores the distinction between 'must' and 'should' and concludes that a patient's medical history "*requires* documentation of a comprehensive, eight-element medical history." AR 18 (emphasis added). Accordingly, in reviewing Dr. Albert's claims, the Council consistently faults Dr. Albert for failing to include various elements of this eight-element history. *See, e.g.,* AR 19 ("There is no description of the beneficiary's prior medical history, interventions, aggravating or mitigating factors."); *id.* ("There is no discussion of the symptoms' onset, frequency, or duration, aggravating or relieving factors or baseline measurements of functional level."); AR 20 ("There is no description of the beneficiary's prior medical history, interventions, aggravating or mitigating factors.").

This was error. The word 'must,' of course, possesses an "unmistakably mandatory character." *Hewitt v. Helms*, 459 U.S. 460, 471 (1983). In contrast, the word 'should' "merely suggest[s] an approach, rather than mandat[es] a step-by-step analysis." *United States v. Harris*, 13 F.3d 555, 559 (2d Cir. 1994); *see also United States v. Maria*, 186 F.3d 65, 70 (2d Cir. 1999) (noting that "the common meaning of 'should' suggests or recommends a course of action"). Indeed, the Policy Manual itself appears to contemplate that the eight-factor medical history prescribes an ideal rather

16

than establishes a baseline, providing, for example, that a physician should include "family history, *if relevant*." Policy Manual, CMS Pub. No. 100–02, Ch. 15, § 240.1.2 (emphasis added).

Having carefully reviewed the extensive administrative record, the Court concludes that Dr. Albert's files consistently incorporate several of the eight-factor history requirements. The following examples are representative. In his notes for patient M.A., Dr. Albert details the symptoms causing M.A. to seek treatment, the quality and character of the symptoms, and the symptoms' frequency and location. *See, e.g.,* AR 794 (noting that "[c]ervical, thoracic, and lumbar malpositioning was identified" and that M.A. continues to experience "stiffness and tightness of the upper back, mid back, and neck radiating to the left shoulder"). Dr. Albert's notes for patient V.B. describe the same three elements. *See, e.g.,* AR 822 (noting that "[t]he patient has a primary complaint of stiffness, tightness and fatigue of the neck, upper back and lower back" and exhibits "moderate to severe decreased function of the cervical and lumbar spine"). The Council was therefore wrong to reject Dr. Albert's claims simply for failure to include all eight elements, without considering whether the elements he *did* submit, when read in conjunction with the remainder of his treatment notes, "fully support[ed] the medical necessity for [chiropractic services]." NAT'L GOV'T SERVS., LCD FOR CHIROPRACTIC SERVICES at 13 (L27350) (2008).

The question, then, is whether the Court can overlook the Council's error or

whether remand is warranted. As the Second Circuit has noted, "[w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the [agency]." *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984). At the same time, "[w]here application of the correct legal principles to the record could lead only to the same conclusion, there is no need to require agency reconsideration." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (internal punctuation marks omitted) (quoting *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

It is concededly true that the Council noted other errors in several of Dr. Albert's files, and that these errors pertained to mandatory requirements in the Chiropractic LCD. *See, e.g.,* AR 18 (noting lack of precise level of subluxation); AR 20 (noting lack of measurable indications of progress). At oral argument, the government contended that, even if the Council erred in interpreting the medical history requirements, the other insufficiencies noted by the Council constitute independent grounds warranting affirmance under substantial evidence review. The Court disagrees. The Council placed heavy emphasis on the medical history requirements throughout its decision, and referenced the medical history requirements in all but one of the representative beneficiary files it reviewed. *See* AR 18-20 (noting failure to comply with medical history requirements for patients M.A., E.D., L.H., and L.M.). Furthermore, Dr.

Albert's failure to comply with the medical history requirements was a primary reason for denying reimbursement for three of the five sample patient files reviewed by the Council. *See* AR 18 (denying reimbursement for patient M.A. in large part due to failure to include complete history); AR 19 (same analysis with respect to patient E.D.); *id.* (same analysis with respect to patient L.H.).

Accordingly, the Court concludes that the Council's error likely affected the disposition of Dr. Albert's case and that remand is warranted. *See Pollard v. Halter*, 377 F.3d 183, 192 (2d Cir. 2004) (concluding, in a Social Security case, that remand was warranted where Social Security Administration Appeal Council applied incorrect rules and where court could not determine that error was harmless).

## III.

For the foregoing reasons, the Court reverses the decision of the Council and remands for further proceedings consistent with this opinion pursuant to the fourth sentence of 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.").

On remand, the Council shall reconsider whether Dr. Albert's services were reimbursable in light of a correct interpretation of the relevant documentation guidelines. For guidance on remand, the Council shall not deny Dr. Albert's claims

solely for failure to submit an eight-element medical history, but rather shall consider whether the medical history he *did* submit, when taken in totality with his other treatment notes, demonstrates that the patient "ha[s] a significant health problem in the form of a neuro-musculoskeletal condition necessitating treatment" and that "the manipulative services rendered . . . have a direct therapeutic relationship to the patient's condition and provide reasonable expectation of recovery or improvement of function." NAT'L GOV'T SERVS., LCD FOR CHIROPRACTIC SERVICES (L27350) at 4 (2008).

**SO ORDERED.**

/S/ Frederic Block\
FREDERIC BLOCK\
Senior United States District Judge

Brooklyn, New York\
July 28, 2015